**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02468-MSK

ROCKY MOUNTAIN WILD;
NATIONAL PARKS CONSERVATION ASSOCIATION;
CENTER FOR BIOLOGICAL DIVERSITY; and
WILDEARTH GUARDIANS,

       Plaintiffs,

v.

DAVID BERNHARDT, in his official capacity as Secretary of the Interior; and
BUREAU OF LAND MANAGEMENT,

       Defendants,

       and

AMERICAN PETROLEUM INSTITUTE; and INDEPENDENT PETROLEUM
ASSOCIATION OF AMERICA,

       Intervenor-Defendants.

---

ORAL ARGUMENT IS REQUESTED

---

**PLAINTIFFS' REPLY BRIEF**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

I.  BLM Failed to Consider the Impacts of Its Leasing Decision on Air Quality, Public Health, and the Environment .................................................................................2

    A.  BLM Disregarded Its Own Models Projecting Exceedances of the Ozone Standard and Significant Visibility Impairment ..........................................................2

    B.  BLM Cannot Postpone An Analysis of Its Modeling Results .....................................8

II.  BLM Failed to Consider the Irretrievable Impacts of Its Leasing Decision on Inventoried Lands with Wilderness Characteristics ...........................................11

III.  BLM Failed to Consider a Reasonable Range of Alternatives for the June 2018 Lease Sale.......................................................................................................................13

IV.  The Proper Remedy is to Vacate and Set Aside the June 2018 Leases ...........................16

CONCLUSION.................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amigos Bravos v. BLM*,
  No. 6:09-CV-00037-RB-LFG, 2011 WL 7701433 (D.N.M. Aug. 3, 2011) ...................... 10, 11

*Bob Marshal All. v. Hodel*,
  852 F.2d 1223 (9th Cir. 1988) ............................................................................................. 16

*California Communities Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) .......................................................................................... 18, 19

*Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*,
  449 F.2d 1109 (D.C. Cir. 1971) .......................................................................................... 16

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
  819 F. Supp. 2d 1193 (D. Colo. 2011) .................................................................................. 8

*Colo. Envtl. Coal. v. Salazar*,
  875 F. Supp. 2d 1233 (D. Colo. 2012) .............................................................................. 3, 6

*Davis Cty. Solid Waste Mgmt. v. EPA*,
  108 F.3d 1454 (D.C. Cir. 1997) .......................................................................................... 19

*Diné Citizens Against Ruining Our Env't v. Bernhardt*,
  923 F.3d 831 No. 18-2089, 2019 WL 1999298 (10th Cir. 2019) ...................................... 17, 21

*Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining
  Reclamation and Enf't*,
  No. 12-cv-01275-JLK, 2015 WL 1593995 (D. Colo. Apr. 6, 2015) ................................. 19, 22

*Fed. Commc'ns Comm'n v. NextWave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003) ............................................................................................................. 17

*Friends of Animals v. BLM*,
  232 F. Supp. 3d 53 (D.D.C. 2017) ...................................................................................... 14

*Friends of Animals v. BLM*,
  No. 2:16-CV-1670-SI, 2018 WL 1612836 (D. Or. Apr. 2, 2018) .......................................... 14

*Friends of Animals v. BLM*,
  No. 3:15-CV-0057-LRH-WGC, 2015 WL 555980 (D. Nev. Feb. 11, 2015) .................... 13, 15

*Grand Canyon Tr. v. FAA,*
  290 F.3d 339 (D.C. Cir. 2002) ................................................5

*Hanly v. Kleindienst,*
  471 F.2d 823 (2d Cir. 1972) ................................................5

*High Country Conservation Advocates v. U.S. Forest Serv.,*
  52 F. Supp. 3d 1174 (D. Colo. 2014) ................................................7, 8

*High Country Conservation Advocates v. U.S. Forest Serv.,*
  67 F. Supp. 3d 1262 (D. Colo. 2014) ................................................2, 17

*Humane Soc. of U.S. v. Locke,*
  626 F.3d 1040 (9th Cir. 2010) ................................................6

*Idaho Farm Bureau Fed'n v. Babbitt,*
  58 F.3d 1392 (9th Cir. 1995) ................................................19

*Kern v. BLM,*
  284 F.3d 1062 (9th Cir. 2002) ................................................10

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ................................................1, 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................3, 4, 7

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
  668 F.3d 1067 (9th Cir. 2011) ................................................9, 10

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
  241 F.3d 722 (9th Cir. 2001) ................................................9

*New Mexico ex rel. Richardson v. BLM,*
  565 F.3d 683 (10th Cir. 2009) ................................................8, 13, 15

*Olenhouse v. Commodity Credit Corp.,*
  42 F.3d 1560 (10th Cir. 1994) ................................................17

*Or. Nat. Desert Ass'n v. BLM,*
  625 F.3d 1092 (9th Cir. 2010) ................................................8, 14

*Or. Nat. Res. Council Action v. U.S. Forest Serv.,*
  445 F. Supp. 2d 1211 (D. Or. 2006) ................................................5

*Pennaco Energy Inc. v. U.S. Dep't of Interior,*
    377 F.3d 1147 (10th Cir. 2004) ...................................................................16, 17

*Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.,*
    189 F. Supp. 3d 1 (D.D.C. 2016) ............................................................................19

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)...................................................................................................9

*S. Utah Wilderness All. v. Kempthorne,*
    525 F.3d 966 (10th Cir. 2008) .................................................................................20

*S. Utah Wilderness All. v. Norton,*
    457 F. Supp. 2d 1253 (D. Utah 2006)...........................................................*passim*

*San Juan Citizens All. v. BLM,*
    326 F. Supp. 3d 1227 (D.N.M. 2018) ...............................................................5, 18

*Utah Envtl. Cong. v. Bosworth,*
    439 F.3d 1184 (10th Cir. 2006) ...............................................................................18

*Utah Shared Access All. v. U.S. Forest Serv.,*
    288 F.3d 1205 (10th Cir. 2002) ..........................................................................7, 19

*WildEarth Guardians v. Bernhardt,*
    No. 19-CV-001920-RBJ, 2019 WL 5853870 (D. Colo. Nov. 8, 2019)...............4, 22

*WildEarth Guardians v. BLM,*
    870 F.3d 1222 (10th Cir. 2017) ...............................................................................21

*WildEarth Guardians v. U.S. Fish and Wildlife Serv.,*
    784 F.3d 677 (10th Cir. 2015) ...........................................................................10, 16

*WildEarth Guardians v. Zinke,*
    368 F. Supp. 3d 41 (D.D.C. 2019) ......................................................................8, 10

*Wilderness Workshop v. BLM,*
    342 F. Supp. 3d 1145 (D. Colo. 2018).........................................................15, 16, 17

## Statutes

5 U.S.C. § 706(2) .........................................................................................................17

43 U.S.C. § 1701(a)(8)..................................................................................................21

**Other Authorities**

40 C.F.R. § 1502.14 ....................................................................................................................17

43 C.F.R. § 46.120(c)....................................................................................................................7

80 Fed. Reg. 65,292 (Oct. 26, 2015)........................................................................................6, 20

## INTRODUCTION

There is no dispute the June 2018 lease sale will adversely impact public health and the environment.  Air-quality modeling shows that the lease sale will contribute to exceedances of the ozone standard set by the Environmental Protection Agency ("EPA"), thus threatening vulnerable populations, including children, the elderly, and people with respiratory conditions. The June 2018 lease sale will also mar the scenic beauty of Dinosaur National Monument and degrade newly inventoried lands with wilderness characteristics.

The Bureau of Land Management ("BLM") had an obligation under the National Environmental Policy Act ("NEPA") to take a hard look at these impacts and consider alternatives, such as not offering the June 2018 lease sale at all.  This analysis was essential to ensure the agency would not "act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).  Yet, BLM refused to prepare any NEPA analysis for the June 2018 lease sale and instead issued a Determination of NEPA Adequacy ("DNA"), claiming that it could rely on a 2017 Environmental Assessment ("2017 EA") prepared for a totally different lease sale.  This excuse does not withstand scrutiny for three reasons.

First, the 2017 EA claimed there was no evidence to suggest oil and gas leasing contributed to ozone exceedances at the Rangely monitor.  This assertion is flatly contradicted by BLM's modeling in 2018.  BLM must prepare additional NEPA analysis to assess the adverse impacts of its leasing decision on public health and the environment.

Second, because the 2017 EA involved different public lands, it never analyzed the impacts to lands with wilderness characteristics sold at the 2018 lease sale.  Nor did any of BLM's other prior NEPA analysis consider these newly inventoried wilderness values.  BLM concedes these points, confirming that its decision to authorize the lease sale in these unique areas without any additional NEPA analysis was arbitrary and capricious.  *See S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1264–69 (D. Utah 2006) [hereinafter "*SUWA*"].

1

Third, the 2017 EA never contemplated or considered alternatives to the June 2018 lease sale, such as the no-leasing alternative.  As a result, the 2017 EA does not satisfy BLM's obligation to careful consider whether the impacts of the June 2018 lease sale on public health and the environment warrant alternative approaches, such as not leasing the lands at all.

These errors went to the heart of NEPA and led to an uninformed decision to authorize the June 2018 lease sale.  The Court should set aside the leases—the presumptive remedy under the APA—and ensure BLM has a "clean slate" on which it can comply with NEPA's goal of "deliberative, non-arbitrary decision-making."  *High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1265 (D. Colo. 2014) [hereinafter "*High Country II*"].

## ARGUMENT

I.    **BLM Failed to Consider the Impacts of Its Leasing Decision on Air Quality, Public Health, and the Environment.**

     A. **BLM Disregarded Its Own Models Projecting Exceedances of the Ozone Standard and Significant Visibility Impairment.**

BLM's most recent air-quality modeling, CARMMS 2.0, shows that federal oil and gas development will contribute to exceedances of EPA's health-based ozone standard at the Rangely monitor, which is the closest air quality monitor to the 2018 lease sale.  Pls' Opening Br. at 15–18, ECF No. 55 [hereinafter "Pls' Br."].[1]  Yet, BLM never analyzed the serious public health and environmental impacts of these exceedances prior to authorizing the June 2018 lease sale.  *Id.*  Rather than confronting this oversight, BLM attempts to sidestep the issue, arguing that CARMMS 2.0 did not provide any "new" data because BLM had "functionally equivalent" data when it prepared the 2017 EA.  Federal Defs.' Resp. Br. at 13, ECF No. 59 [hereinafter "BLM Resp."].  This argument constitutes an impermissible *post-hoc* rationalization that is contradicted by BLM's own statements in the 2017 EA and underscores BLM's failure to analyze the detrimental consequences of issuing leases that exacerbate ozone pollution.

---

[1] All references to "ECF No." documents are to those docketed in this action, *Rocky Mountain Wild v. Bernhardt*, No. 1:18-cv-02468-MSK (D. Colo.).

As an initial matter, BLM's argument is found nowhere in the administrative record for the 2018 lease sale, and thus must be rejected as an impermissible *post-hoc* rationalization. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). During the administrative process, the Conservation Groups explained how CARMMS 2.0 shows that BLM-authorized oil and gas development will contribute to exceedances of the ozone standard at the Rangely monitor in northwest Colorado. *See* BLM014951–52.[2] In response, BLM never claimed that this information was buried in the Model Attainment Test Software ("MATS") results in CARMMS 1.5—the excuse it now raises in briefing before this Court. *See* BLM Resp. at 12–13. In fact, the 2018 DNA omits *any* reference to the MATS result, let alone a discussion of the limitations of those results. *See* BLM015788–806; BLM016188–205; *see also* BLM16220–21.[3] BLM's last-minute argument is "the type of post-hoc justification for an action that is offered in litigation, rather than a justification given by the agency at the time of the decision. Thus, it is insufficient to discharge the agency's action under NEPA." *Colo. Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1249–50 (D. Colo. 2012).

BLM's newfound argument also contradicts its own statements in the 2017 EA. There, BLM claimed there was "no evidence to suggest" federal oil and gas development contributed to

---

[2] CARMMS uses a photochemical grid model (known as CAMx) to determine how much BLM-authorized energy development in each field office contributes to ozone pollution and visibility impairment at specific monitors. BLM015097–98; BLM015143–60. CARMMS 1.5 did not run CAMx for the Rangely monitor, as there was insufficient monitoring data at the time. Pls' Br. at 15. By contrast, in 2018, CARMMS 2.0 had enough data to run CAMx for the Rangely monitor, revealing exceedances of the ozone standard at this site under every development scenario and identifying BLM oil and gas development as a contributing source. BLM015262–64; *see also* Pls. Br. Exh. 1, ECF No. 55-1 (CARMMS 2.0 Tables 5-39, 5-39a, and 5-39b highlighting ozone exceedances at the Rangely monitor in Rio Blanco).

[3] Unlike the source apportionment modeling provided by CAMx, MATS does not demonstrate how much each BLM field office contributes to high levels of ozone pollution. It is not equivalent to the ozone-tracing provided by CAMx for the Rangely monitor, a point BLM entirely overlooks in its briefing.

ozone exceedances at the Rangely monitor.  BLM012111.  BLM further asserted that ozone levels at the Rangely monitor "are usually well below the current standard." *Id.*  These statements underscore the significance of the new information provided by CARMMS 2.0, which demonstrated that federal oil and gas development would contribute to exceedances of the ozone standard at the Rangely monitor through 2025, precisely what the 2017 EA claimed was missing.  BLM015262–64; *see also* Pls. Br. Exh. 1, ECF No. 55-1 (CARMMS 2.0 Tables 5-39, 5-39a, and 5-39b).  BLM had an obligation to consider this new information because it "completely reverse[s]" BLM's previous position in the 2017 EA.  *See WildEarth Guardians v. Bernhardt*, No. 19-CV-001920-RBJ, 2019 WL 5853870, at *13 (D. Colo. Nov. 8, 2019).

If anything, BLM's *post-hoc* theory simply underscores the agency's repeated failure to analyze the public health and environmental impacts of leasing more lands for oil and gas development in an area that already suffers from unhealthy levels of ozone pollution.  Even assuming BLM had "functionally equivalent" data to CARMMS 2.0 when it prepared the 2017 EA, as it now contends, it disregarded that evidence in the 2017 EA.  *See* BLM012111 (disclaiming any "evidence to suggest" oil and gas development contributed to exceedances of the ozone standard at the Rangely monitor).  As a result, the 2017 EA contains *no* analysis of the public health threats of issuing more oil and gas leases that will exacerbate dangerous levels of ozone pollution in northwest Colorado.  *See, e.g.* BLM012111.  The 2017 EA, and the 2018 DNA, thus overlooked an "important aspect of the problem," rendering them arbitrary and capricious.  *See State Farm*, 463 U.S. at 43.  BLM cannot rely on this flawed analysis to support its June 2018 leasing decision.  *See SUWA*, 457 F. Supp. 2d at 1266 (BLM's use of a DNA "without adequate NEPA analyses to rely upon, was arbitrary, capricious, and contrary to law, and it must be set aside.").

Rather than addressing the flaws in its NEPA analysis, BLM mischaracterizes the issue, claiming that the Conservation Groups have not "refuted or otherwise rendered invalid the CARMMS 1.5 study."  BLM Resp. at 11; *see also* Intervenor-Def. Associations' Responsive Br. at 21, ECF No. 61 [hereinafter "IPAA Resp."].  The problem, however, is not CARMMS 1.5

itself.  The problem is that neither BLM's 2017 EA, which relied on CARMMS 1.5, nor its 2018 lease sale decision, accounted for the reasonably foreseeable impacts of the 2018 lease sale projected in CARMMS 2.0, which shows that federal oil and gas development will contribute to exceedances of the ozone standard at Rangely monitor.  *See Or. Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1227 (D. Or. 2006) ("[T]he record must show that the agency has taken a hard look at the question and made a reasonable decision.").  BLM's failure to analyze its modeling results—whether CARMMS 1.5 or CARMMS 2.0—to assess the impacts of the June 2018 leasing decision violates NEPA.  *See id.* at 1226 ("[I]including documents in the administrative record, without analyzing them in the context of their bearing on the proposed action, does not satisfy the requirement that the agency make a reasoned decision based on its evaluation of the significance or lack of significance of the new information."); *see also San Juan Citizens All. v. BLM*, 326 F. Supp. 3d 1227, 1254 (D.N.M. 2018) ("Because BLM failed to use the information it had at this stage to consider the impacts of the agency action on water quantity, BLM failed to meet its duty to take a hard look at the environmental impacts of the proposed action.").

   For the same reason, there is no basis for BLM's conclusory assertion that the individual contribution to ozone pollution from its leasing decision is "minimal."  BLM016221.  BLM never analyzed the impacts of these contributions to the projected exceedances of the ozone standard *because its NEPA analysis never acknowledged those exceedances at all*.  This was a critical error as the additional ozone pollution from the June 2018 lease sale will threaten vulnerable populations and "may represent the straw that breaks the back of the environmental camel."  *See Hanly v. Kleindienst*, 471 F.2d 823, 831 (2d Cir. 1972); *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002) (explaining that an "agency's EA must give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in a vacuum").  Without that discussion, BLM "cannot know what the environment[al] effects of leasing and development will be" on public health and the environment.  *SUWA*, 457 F. Supp. 2d at 1266.

BLM also claimed that the projected exceedances at the Rangely monitor are "immaterial" because "short-term exceedances (over a single year)" are irrelevant. BLM Resp. 13–14. This argument appears nowhere in the Administrative Record and must therefore be rejected as an impermissible *post-hoc* rationalization. *Colo. Envtl. Coal.*, 875 F. Supp. 2d at 1249–50. It is also flatly contradicted by EPA, which documented the "causal relationship between short-term [ozone] exposure and respiratory health effects," including respiratory-related hospital admissions, emergency department visits, and even mortality. *See* National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,323 (Oct. 26, 2015). These adverse effects occur almost immediately after ozone exposure, *id.* at 65,336 (documenting a "rather immediate response" to ozone exposure), and are particularly pronounced for people with asthma, children, older adults, and outdoor workers, *id.* at 65,323. EPA's observations highlight BLM's failure to analyze the significant, adverse effects of exceeding the ozone standard.[4]

In addition to disregarding the public health impacts of its leasing decision, BLM also overlooked the significant contributions of oil and gas development to visibility impairment at Dinosaur National Monument. BLM relies on the 2017 EA for the proposition that there will be "no days" with significant visibility impairment at Dinosaur National Monument. BLM Resp. at 15 (citing BLM011387). CARMMS 2.0, however, flatly refutes that assertion, documenting up to four days of significant visibility impairment at Dinosaur National Monument. BLM015199–200. BLM has thus failed to demonstrate that the 2017 EA "adequately assesses the

---

[4] Likewise, the Court should reject BLM's *post-hoc* argument that CARMMS 2.0 modeling results "do *not* project any ozone exceedances in the specific areas over the Rangely monitor." BLM Resp. at 14 (citing Figure 5-1a and Figure 5-1b at BLM015266–67) (emphasis added). This novel assertion appears nowhere in the record. It is also contrary to the very figures cited by BLM, which project exceedances in Rio Blanco County, BLM015266–67, as further confirmed by the modeling results for this specific monitor, BLM015262–64; *see also* Pls. Br. Exh. 1 (Tables 5-39, 5-39a, and 5-39b highlighting ozone exceedances at the Rangely monitor in Rio Blanco). BLM's *post-hoc* rationalization "serve[s] only to underscore the absence of an adequate explanation in the administrative record itself." *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010).

environmental effects of the proposed action," precluding its use of a DNA.  *See* 43 C.F.R. §
46.120(c).

BLM cannot paper over these errors by claiming that it analyzed these air quality impacts
in its prior Resource Management Plans ("RMPs").  BLM Resp. at 16–17.  Tellingly, BLM does
not cite any portions of those RMPs that address the significant public health impacts associated
with exceedances of the ozone standard.  In the White River RMP Amendment Environmental
Impact Statement ("EIS"), the agency refused to analyze the results of the prior modeling
(CARMMS 1.0) on the grounds that "incorporation of the CARMMS results will be done during
site-specific NEPA analyses."  BLM014955.  Having deferred that analysis at the RMP stage,
BLM cannot now cite back to an analysis that never took place.  BLM's shell game "makes no
sense" and simply underscores its repeated failure to evaluate the public health and
environmental impacts of its leasing decision.  *See High Country Conservation Advocates v. U.S.
Forest Serv.*, 52 F. Supp. 3d 1174, 1199 (D. Colo. 2014) [hereinafter "*High Country I*"] ("If site-
specific analysis was to be postponed, then it should have been performed at a later
opportunity.").

Contrary to Industry-Intervenors' mischaracterization, this is not a case where Plaintiffs
"disagree with the methodology" used by the agency.  IPAA Resp. at 21 (quotation and
alteration omitted).  Rather, BLM completely failed to consider the evidence in its "own files"
projecting exceedances of standards imposed to protect public health and welfare, a "textbook"
violation of NEPA.  *SUWA*, 457 F. Supp. 2d at 1264–65; *see State Farm*, 463 U.S. at 43 ("[T]he
agency must examine the relevant data and articulate a satisfactory explanation for its action
including a rational connection between the facts found and the choice made." (internal quotation
omitted)).

Industry-Intervenors also cannot cure this oversight by invoking deference.  IPAA Resp.
at 17–18.  As the Tenth Circuit has cautioned, deference only applies where an agency "made a
reasoned evaluation of the available information," thereby demonstrating its exercise of
discretion was "truly informed."  *See Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d

1205, 1213 (10th Cir. 2002).  Here, BLM wholly failed to analyze the projected exceedances of

the ozone standard, and thus is entitled to no deference whatsoever.  *See High Country I*, 52 F.

Supp. 3d at 1186 ("But the Court will not 'defer to a void.'") (quoting *Or. Nat. Desert Ass'n v.*

*BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010)).

**B.  BLM Cannot Postpone An Analysis of Its Modeling Results.**

BLM does not dispute that the June 2018 leasing decision makes an "an irrevocable

commitment to allow some" air pollution.  Pls' Br. at 14 (quoting *WildEarth Guardians v. Zinke*,

368 F. Supp. 3d 41, 66 (D.D.C. 2019)); *see also SUWA*, 457 F. Supp. 2d at 1256 ("in the fluid

minerals program, the point of irretrievable and irreversible commitment occurs at the point of

lease issuance.").  Accordingly, BLM had an obligation to use its existing air-quality models to

analyze the "reasonably foreseeable" impacts of its leasing decision on public health and the

environment.  *See New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 718 (10th Cir. 2009).

BLM cannot defer its analysis of ozone exceedances on the grounds that it would be

"more useful" *after* it has issued the leases.  BLM Resp. at 17.  The assessment of reasonably

foreseeable impacts "*must* take place before an 'irretrievable commitment of resources' is

made." *Richardson*, 565 F.3d at 718 (emphasis added).  BLM cannot circumvent this clear

obligation for its own convenience.  *See Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F.

Supp. 2d 1193, 1210 n.24 (D. Colo. 2011) (explaining that analysis of impacts "*must absolutely*"

take place before the irretrievable commitment of resources occurs) (emphasis in original).

Furthermore, BLM's excuse for delaying its analysis rests on a series of misstatements

that are contradicted by the record.  First, BLM claims that it cannot undertake any analysis at

this time because it might "overestimate" impacts.  BLM Resp. at 18.  But CARMMS 2.0

projects exceedances of the ozone standard at the Rangely monitor under *every* development

scenario, a point nobody disputes.  *See* BLM015262–64; *see also* Pls. Br. Exh. 1 (CARRMS 2.0

Tables 5-39, 5-39a, and 5-39b).  While Industry-Intervenors note that BLM may be able to

undertake an even more precise analysis at the development stage, IPAA Resp. at 25, that does

not excuse the BLM from using the "information it had at this stage . . . to meet its duty to take a

8

hard look at the environmental impacts of the proposed action," *see San Juan Citizens All.*, 326

F. Supp. 3d at 1254.[5]

Second, BLM assumes that any ozone impacts need not be analyzed because they may be

"minimal." BLM Resp. at 17 n.8. This is pure speculation given BLM has never analyzed the

issue. It is also defied by CARMMS 2.0 and the hundreds of studies assembled by EPA, which

document the adverse effects of ozone exposure at levels in excess of the ozone standard. BLM

must take a hard look at this information so as to ensure "important effects will not be

overlooked or underestimated only to be discovered after resources have been committed or the

die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989);

*see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 732–33 (9th Cir. 2001)

(explaining that the purpose of NEPA "is to obviate the need for speculation by insuring that

available data are gathered and analyzed prior to the implementation of the proposed action"),

*abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157

(2010).

Third, BLM suggests that it can postpone the requisite NEPA analysis because it included

measures to "monitor" and "mitigat[e]" development on the leases. BLM Resp. 17 at n.8.

Mitigation is, however, no substitute for NEPA analysis. *See N. Plains Res. Council, Inc. v.*

*Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011) ("[M]itigation measures, while

necessary, are not alone sufficient to meet . . . NEPA obligations to determine the projected

extent of the environmental harm to enumerated resources *before* a project is approved.").

Furthermore, BLM cannot know whether these mitigation measures are adequate "without first

---

[5] Indeed, Industry-Intervenors acknowledge that CARMMS 2.0 provides "detailed" information
about "potential air quality impacts based upon existing knowledge at the lease sale stage,"
IPAA Resp. at 25, further underscoring why BLM must consider this information before issuing
the leases.

understanding the extent of the problem." *Id.* at 1085.[6]  BLM must therefore analyze the impacts

of its action on air quality *before* it issues leases so that it can make an informed decision about

whether it needs to withhold leases (or require additional mitigation) to achieve air quality

standards.  *See Zinke*, 368 F. Supp. 3d at 65 ("[A]n agency cannot defer analyzing the reasonably

foreseeable environmental impacts of an activity past the point when that activity can be

precluded.").

     BLM relies heavily on *Amigos Bravos v. BLM*, No. 6:09-CV-00037-RB-LFG, 2011 WL

7701433, at *14 (D.N.M. Aug. 3, 2011), but that case is readily distinguishable and actually

supports the Conservation Groups' position.  There, the plaintiffs demanded *additional* air-

quality modeling at the leasing stage to quantify the impacts of hypothetical "full field

development."  *Id.*  Here, by contrast, the Conservation Groups are not demanding additional

modeling of "full-field" development.  Rather, the Conservation Groups challenge BLM's failure

to account for its *existing* models projecting exceedances of the ozone standard under BLM's

*own* estimate of reasonably-foreseeable development.  Pls. Br. at 14–20; *see also* BLM015262–

64 (Tables 5-39, 5-39a, and 5-39b).  This oversight violates NEPA.  *See Diné Citizens Against*

*Ruining Our Env't v. Bernhardt*, No. 18-2089, 2019 WL 1999298, at *18 (10th Cir. May 7,

2019) (requiring BLM to analyze the cumulative impacts of its own reasonably foreseeable

development scenario); *see also Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002) ("It is not

appropriate to defer consideration of cumulative impacts to a future date when meaningful

consideration can be given now.").

---

[6] Industry-Intervenors rely on *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d
677, 694 (10th Cir. 2015), for the proposition that BLM can rely on lease stipulations to forego
NEPA analysis.  IPAA Resp. at 2.  Not so.  In *WildEarth Guardians*, the agency did not forego
NEPA; it prepared an EA and concluded that future regulations were adequate.  *Id.*  The court
concluded that plaintiffs presented no "good explanation" to the contrary.  *Id.*  Here, by contrast,
BLM did not undertake any NEPA analysis to determine whether its stipulations are adequate to
protect public health.  Moreover, the Conservation Groups have demonstrated that the leases
will contribute to exceedances of the ozone standard under every development scenario.  Pls. Br. at
9–11, 14–15.

In fact, *Amigos Bravos* underscores BLM's obligation to use its own models to take a hard look at the reasonably foreseeable impacts of its leasing decision. There, the court rejected the notion that BLM could "forego all air quality analysis at the leasing stage." *Amigos Bravos*, No. 6:09-CV-00037-RB-LFG, 2011 WL 7701433 at *13. The court upheld BLM's analysis because the agency had considered its recent ozone modeling, determined that ozone levels in the San Juan Basin would not exceed the ozone standards, and consequently concluded that "air quality in the areas of the proposed lease tracts is generally good." *Amigos Bravos,* No. 6:09-CV-00037-RB-LFG, 2011 WL 7701433, at *11. Here, by contrast, BLM failed to consider its own models and the threat to public health and the environment they forecast.

## II.    BLM Failed to Consider the Irretrievable Impacts of Its Leasing Decision on Inventoried Lands with Wilderness Characteristics.

In 2012 and 2013, BLM inventoried four areas in the Little Snake Field Office, identifying their unique wilderness values for the first time. BLM015514–752. BLM's RMP for the Little Snake Field Office predated these inventories, and thus did not analyze the wilderness values of these areas. Pls' Br. at 22–23. The 2017 EA also omits any analysis of these inventoried wilderness values because it analyzed different lands. *Id.* at 22. Yet, BLM authorized oil and gas leases in these newly inventoried areas in the June 2018 lease sale without analyzing how those lands would be affected.

Instead of disputing these facts, BLM suggests that the caselaw does not require consideration of impacts to wilderness values. BLM Resp. at 19. Not so. *Southern Utah Wilderness Alliance v. Norton*, cited in the Conservation Groups' opening brief, is directly on point. 457 F. Supp. 2d at 1255. There, BLM undertook new wilderness inventories, concluding "for the first time" that certain areas in Utah had wilderness character. *Id.* at 1258–59. Yet, BLM authorized a lease sale in those areas based on a DNA (i.e., without preparing any NEPA analysis of these new inventories). *Id.* The court rejected this approach, finding that the agency had overlooked a "textbook example of significant new information about the affected environment"—the wilderness attributes of the newly inventoried lands—"that would be

impacted by oil and gas development." *Id.* at 1264.  This information "was not reflected in BLM's existing NEPA analyses," rendering its reliance on a DNA arbitrary and capricious.  *Id.* at 1265.  The lease sale challenged in this case is on all fours with *SUWA*, clearly demonstrating that BLM violated NEPA by relying on a DNA for the June 2018 lease sale and foregoing any additional NEPA analysis of the impacts on newly inventoried wilderness values.

BLM also is wrong in arguing that it "generally" considered the impacts to these lands when it developed the RMP for this region.  *See* BLM Resp. at 19 (citing *generally* BLM002410–72, BLM002541–58).  *SUWA* flatly rejected this very excuse.  There, BLM tried to "explain away" its failure to consider new wilderness inventories, claiming that "its earlier documents *generally* dealt with the issue."  *SUWA*, 457 F. Supp. 2d at 1266 (emphasis in original).  The court disagreed, holding that:

> BLM arbitrarily ignored new information (information produced by the agency itself) in an effort to approve oil and gas leasing and ultimately development of these lands. BLM cannot know what the environment[al] effects of leasing and development will be to the specific wilderness values, in these specific places, if it declines to undertake the necessary supplemental analysis to evaluate whether its current leasing categories adequately protect these newly identified resources.

*Id.*  So too here, BLM does not know what the environmental effects of the June 2018 leasing decision will be on the specific wilderness values of the four recently inventoried areas, violating NEPA's "manifest concern with preventing uninformed action."  *Marsh*, 490 U.S. at 371.

If anything, BLM's arguments simply underscore its failure to consider the wilderness values of these newly inventoried areas.  BLM highlights a statement in the Little Snake Field Office RMP where it decided to forego protecting "several other areas of lands with wilderness characteristics" that had been identified in 2010.  BLM Resp. at 19 (citing BLM002606).  That statement did not refer to the areas at issue here, which were not inventoried until 2012 or 2013. *See* Pls' Br. at 22–23 & n.10.  Just as in *SUWA*, "BLM cannot reasonably rely on its outdated

planning documents to argue that these values were previously identified or that the impacts of oil and gas development on them were previously evaluated." 457 F. Supp. 2d at 1265.[7]

Equally flawed is BLM's assumption that it could rely on the 2017 EA because "the geographic and resource conditions" of the June 2018 lease sale are "sufficiently similar to those addressed in the June 2017 EA." BLM Resp. at 11. Unlike the June 2018 lease sale, the 2017 lease sale did not overlap any lands with inventoried wilderness characteristics, and the 2017 EA lacks any analysis of impacts to wilderness values. *See* BLM011534 ("There are no inventoried lands with wilderness characteristics overlapping these lease parcels in the LSFO."). By contrast, the June 2018 lease sale overlaps four newly inventoried areas, threatening the unique attributes of these areas. These significant differences preclude BLM's reliance on a DNA and decision to forego additional NEPA analysis. *See SUWA*, 457 F. Supp. 2d at 1266; *Friends of Animals v. BLM*, No. 3:15-CV-0057-LRH-WGC, 2015 WL 555980, at *3 (D. Nev. Feb. 11, 2015) (striking down BLM's reliance on a DNA for a proposed action that "exceeds the intensity and scope of what was proposed" in a prior EA).

Industry-Intervenors disregard these distinctions, claiming that BLM's reliance on the 2017 EA was appropriate because it considered the impacts of developing "73,000 acres across the same Field Offices" as the June 2018 lease sale. IPAA Resp. at 19–20; *see also* BLM Resp. at 11. This is a false comparison because the June 2018 lease sale impacts different lands with different resource characteristics, including newly inventoried areas with wilderness values. It is thus absurd to claim that the lease sales are similar simply because they occur within the "same

---

[7] BLM's approach in this case is also inconsistent with the approach it took in *Richardson*, 565 F.3d at 712 n.35, to protect newly-inventoried lands with wilderness characteristics. There, BLM was presented "with an extensive reinventory of the wilderness characteristics of lands in the plan area," which identified an additional 10,665-area with wilderness characteristics. *Id.* Because this new area had been overlooked during its prior planning process, BLM "decided to manage this area 'in a manner that will preserve the entire range of management options ... until a land use plan revision is completed for the area." *Id.* By contrast, here, BLM issued oil and gas leases in the newly inventoried areas, despite the fact they had never been analyzed before in a land use plan. This approach foreclosed BLM's ability to protect these areas. *Id.* at 710 ("A parcel of land cannot both be preserved in its natural character and mined.").

Field Offices," IPAA Resp. at 19, which encompass approximately 6.1 million acres of surface and subsurface estate.[8]  Industry-Intervenors's false comparison underscores why BLM's conclusory reliance on a DNA was arbitrary and capricious.  *See Friends of Animals v. BLM*, No. 2:16-CV-1670-SI, 2018 WL 1612836, at *14 (D. Or. Apr. 2, 2018) (rejecting BLM's "conclusory" assertion that the impacts of a decision were "the same" as a prior decision).[9]

BLM is required to inventory wilderness characteristics on public lands so that it can determine whether "to afford them protection from extractive uses, or from potentially destructive uses." *Or. Nat. Desert Ass'n*, 625 F.3d at 1114.  BLM ignored that duty by failing to use its inventory in deciding whether to protect those lands from oil and gas development.  These inventories represent "a textbook example of significant new information about the affected environment" that must be analyzed under NEPA to ensure informed decision-making *before* the agency irrevocably leases these unique lands for oil and gas development.  *SUWA*, 457 F. Supp. 2d at 1264.

## III.  BLM Failed to Consider a Reasonable Range of Alternatives for the June 2018 Lease Sale.

Agencies violate NEPA if they lease lands for oil and gas development without considering a reasonable range of alternatives, including a "no-leasing" alternative.  *See SUWA*, 457 F. Supp. 2d at 1263 (collecting cases).  BLM concedes the point, BLM Resp. at 20, but then fails to identify any NEPA document that undertook this fundamental inquiry for the June 2018 lease sale.

---

[8] The White River Field Office covers approximately 1.5 million surface acres and 2.2 million acres of federal oil and gas minerals (subsurface) estate.  BLM010020.  The Little Snake Field Office covers approximately 1.3 million acres of surface federal ownership and 1.1 million acres of federal mineral estate.  BLM001912.  The Kremmling Field Office covers approximately 377,900 surface acres of public lands and approximately 653,500 subsurface acres of mineral estate.  BLM004248.

[9] This case is readily distinguishable from the case cited heavily by Industry-Intervenors, *Friends of Animals v. BLM*, 232 F. Supp. 3d 53 (D.D.C. 2017).  There, the court upheld the use of a DNA because the proposed action was "essentially similar" to a previous one.  *Id.* at 61.  By contrast, the June 2017 and June 2018 lease sales impact significantly different resources, precluding any such assertion in this case.

14

BLM relies heavily on the 2017 EA, claiming it "provided and [sic] adequate basis" for assessing whether or not to lease the lands at issue in the June 2018 lease sale.  BLM Resp. at 20. This assertion is directly contradicted by the 2017 EA, which was prepared for a different lease sale and never "contemplated or considered" the June 2018 lease sale.  *See Friends of Animals*, No. 3:15-CV-0057-LRH-WGC, 2015 WL 555980 at *3.  By its terms, the 2017 EA focused solely on the decision of whether or not to lease the specific parcels nominated for the June *2017* lease sale.  BLM011350 ("BLM will decide whether to lease all the nominated parcels, or to defer certain parcels and, if so, under what terms.").  Accordingly, the 2017 EA defined the no-action alternative as deferring the "nominated lease parcels from the June 2017 lease sale." BLM011356.  This no-action alternative does not encompass "the specific portion of land at issue" in the June 2018 leasing decision, and thus cannot satisfy BLM's obligation to rigorously explore a no leasing alternative for this lease sale.  *See Wilderness Workshop v. BLM*, 342 F. Supp. 3d 1145, 1166 (D. Colo. 2018) (citing *Richardson*, 565 F.3d at 709).[10]

There is no basis for BLM's conclusory assertion that the "geographic and resource conditions" of the 2017 and 2018 lease sales are "sufficiently similar" to justify its reliance on the alternatives analysis in the 2017 EA.  BLM Resp. at 20.  None of the leases sold in 2017 impacted lands with wilderness characteristics.  Furthermore, the 2017 EA never considered the public health consequences of issuing leases that would contribute to exceedances of the ozone standard.  By contrast, these resource conflicts are present for the June 2018 lease sale, "alter[ing] the environmental impact and the cost-benefit balance" of the sale and underscoring BLM's obligation to rigorously explore alternatives, "including total abandonment of the

---

[10] BLM appears to suggest that it could rely on the 2017 EA for any leasing decisions in the White River Field Office, Little Snake Field Office, and Kremmling Field Office.  BLM Resp. at 20.  The 2017 EA rejected any such notion, expressly stating that it was limited to "the impacts of leasing the specific parcels described here."  BLM011358.  It did not purport to provide a sweeping analysis for these field offices, which cover approximately 6.1 million acres.  *Id.* ("Whether to halt all oil and gas lease sales is beyond the scope of the decision for which this EA has been prepared.").

project." *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971); *see also Bob Marshal All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988) ("[A]ny proposed federal action involving unresolved conflicts as to the proper use of resources triggers NEPA's consideration of alternatives requirement").

As an afterthought, BLM also points to its RMPs for the various field offices, BLM Resp. at 20, but they plainly did not consider in detail a no-leasing alternative for the parcels at issue in this lease sale, Pls' Br. at 25. BLM acknowledges as much, noting that the RMPs considered a "range of alternatives that would make select lands *open* to oil and gas leasing." BLM Resp. at 20 (emphasis added). In other words, oil and gas leasing could occur in all of these RMPs, even if the no-action alternative had been chosen. Pls' Br. at 25. These RMP EISs did not therefore consider a no-leasing alternative for the lands at issue here, and thus cannot justify BLM's reliance on a DNA. *See Pennaco Energy Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1160 (10th Cir. 2004) (holding that a DNA violated NEPA where it relied on prior EISs that failed to consider alternatives to energy development, "such as not issuing leases at all"). Furthermore, these EISs merely considered whether to leave millions of acres of public lands open to future oil and gas development, a preliminary decision that is substantively distinct from the instant decision to irretrievably lease specific lands for oil and gas development. *See Wilderness Workshop*, 342 F. Supp. 3d at 1166 (holding that "an alternative of no development in the plan area as a whole" is "in fact different than analyzing an alternative of no development for the specific portion of land at issue" in a leasing decision).

Industry-Intervenors try to excuse BLM's failure to consider a no-leasing alternative on the grounds that NEPA does not "automatically" require such an analysis. IPAA Resp. at 26 (citing *WildEarth Guardians*, 784 F.3d at 696). As an initial matter, BLM does not even make this argument, acknowledging that it had an obligation to demonstrate that its prior NEPA documents, including the 2017 EA, considered a reasonable range of alternatives, including a "No Action Alternative." *See* BLM Resp. at 19–20 (noting BLM's obligation "to rigorously

16

explore and objectively evaluate all reasonable alternatives" before relying on a DNA); *see also* BLM015796.

Industry-Intervenors' argument also mischaracterizes *WildEarth Guardians*, which did not eliminate the requirement to consider a reasonable range of alternatives. 784 F.3d at 696. The court reaffirmed the obligation to consider a no-action alternative in every EIS and explained that the absence of such an analysis in an EA could "severely" compromise the agency's decision-making process. *Id.* (citing 40 C.F.R. § 1502.14). That applies here given that BLM wholly failed to consider a no-leasing alternative for the 2018 lease sale in any of its prior EISs or the 2017 EA. It irretrievably leased these lands for oil and gas development, without ever evaluating whether to defer the lease sale to avoid harmful impacts on public health and iconic places. Such uninformed decision-making violates NEPA, as made clear by Tenth Circuit caselaw. *See Pennaco*, 377 F.3d at 1160 (holding that failure to consider a no-leasing alternative precluded use of DNA); *See SUWA*, 457 F. Supp. 2d at 1263–64 (same).

## IV. The Proper Remedy is to Vacate and Set Aside the June 2018 Leases.

No party disputes that vacatur is the presumptive remedy under the APA. *See* 5 U.S.C. § 706(2) (providing that courts "shall . . . set aside" unlawful agency action). This remedy is also essential to NEPA's goal of ensuring that agencies act only after they fully analyze and disclose the potential impacts of proposed actions. *High Country II*, 67 F. Supp. 3d at 1264–66 ("NEPA's goals of deliberative, non-arbitrary decision-making would seem best served by the agencies approaching these actions with a clean slate."). Thus, as recognized by both the Supreme Court and the Tenth Circuit, "[t]he [APA] requires federal courts to set aside federal agency action that is 'not accordance with law.'" *Fed. Commc'ns Comm'n v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575–76 (10th Cir. 1994) (noting agency action "will be set aside if it is the product of a decisionmaking process deemed arbitrary or capricious").

Indeed, the Tenth Circuit regularly requires vacatur of arbitrary agency decisions. *See e.g.*, *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019)

17

(remanding to the district court with instructions to vacate applications to drill oil and gas wells "[b]ecause we conclude that the BLM violated NEPA"); *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006) (reversing district court and remanding with instructions for that court to vacate the arbitrary agency decision).  Courts also regularly vacate oil and gas leases where agencies failed to analyze and disclose the impacts of their leasing decisions, just as BLM did here.  *See, e.g.*, *San Juan Citizens All.*, 326 F. Supp. 3d at 1250, 1254, 1256 (setting aside oil and gas leases where BLM violated NEPA by failing to disclose climate change and water quantity impacts); *SUWA*, 457 F. Supp. 2d at 1269 ("Accordingly, the BLM's decision to lease these four parcels must be set aside as a violation of NEPA.").

Against the weight of this authority, BLM relies on the Ninth Circuit's decision in *California Communities Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012), for its claim that vacatur is not appropriate here, BLM Resp. at 21–22.  However, the Tenth Circuit has not adopted *California Toxics*'s test for determining when a defendant has overcome the presumption that vacatur is the appropriate remedy.  In any event, BLM has failed to show this case meets the narrow exception to vacatur under *California Toxics*.[11]  In that case, the Ninth Circuit explained that "[w]hether agency action should be vacated depends on [1] how serious the agency's errors are and [2] the disruptive consequences of an interim change that may itself be changed."  *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quotation omitted).

First, BLM cannot downplay the seriousness of its NEPA violations by claiming that it merely failed to "fully" discuss the impacts of its June 2018 lease sale.  BLM Resp. at 22.  BLM conducted absolutely no analysis of its June 2018 sale, and instead, relied on a DNA that cited a 2017 EA for the sale of entirely different parcels.  *See supra* Sections I, II.  Furthermore, BLM failed to analyze or discuss alternatives to its June 2018 leasing decision, including not leasing these parcels at all.  *See* supra Section III.  These violations go to the core of NEPA's purposes to

---

[11] Industry-Intervenors similarly claim that this case meets the exception for vacatur, raising the same arguments as BLM.  IPAA Resp. at 32–34.

ensure that agencies analyze impacts and consider alternatives to inform the public and decision-maker.  *Utah Shared Access All.*, 288 F.3d at 1207 (explaining that NEPA "ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process").  Thus, BLM's claim that it could justify retaining the leases sold in the June 2018 sale on remand, BLM Resp. at 22, is entirely speculative—particularly where the agency has yet to analyze the impacts of its leasing decision.  There can be no doubt that BLM's multiple NEPA violations were "serious . . . errors."  *Cal. Cmtys. Against Toxics*, 688 F.3d at 992.

Second, BLM claims vacatur is not appropriate because it would disrupt "public and private economic interests" in developing the leases.  BLM Resp. at 21–22.  This argument impermissibly presumes leaseholders obtained "legally cognizable interests," even though BLM violated NEPA.  BLM Resp. at 21.  BLM should not be permitted to bootstrap harm from its own legal violation.  Even if it could, none of the leases have been developed, undercutting BLM's attempt to use economic harms to overcome the presumption that vacatur is the proper remedy.  *See, e.g.*, *Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 3 (D.D.C. 2016) (expressing reluctance to consider economic harm as a reason for deviating from the normal remedy of vacatur for a NEPA violation, particularly absent a "strong showing" of such harm); *Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclamation and Enf't*, No. 12-cv-01275-JLK, 2015 WL 1593995, at *2–3 (D. Colo. Apr. 6, 2015) (rejecting defendants' claims of economic harm as insufficient to overcome vacatur presumption).

Rather, courts limit the exception to vacatur to cases where there would be serious irreparable environmental harm, or other significant harms to the public interest, that would result from vacatur.  *See, e.g.*, *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997) (finding air pollution guidelines inadequate, but declining to vacate them during remand because "greater pollution emissions . . . would occur" if the guidelines were lifted); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (concluding agency

violated APA in adopting a rule to protect an endangered species, but declining to vacate Endangered Species Act protections without which the species might become extinct).  None of those situations are present here.  To the contrary, BLM's leasing decision would exacerbate exceedances of the ozone standard and threaten public health, as thoroughly documented by EPA.  *See generally* 80 Fed. Reg. 65,292; *see also* Pls' Br. at 5–11, 14–20.  The leasing decision would also have severe impacts on unique public lands, like Dinosaur National Monument and the newly inventoried lands with wilderness characteristics that overlap with parcels leased in the June 2018 sale.  *See* Pls' Br. at 9–11, 16–18, 20–23.  These unanalyzed adverse effects underscore the appropriateness of vacating the leases.

Western Energy Alliance ("WEA") contends that vacatur is inappropriate because it would negatively impact a member's plan to develop a lease in the "most economically and environmentally sensitive manner."[12]  Br. of Amicus Curiae W. Energy All. at 5–8, ECF No. 62-1 at ¶9 [hereinafter "WEA Br."]; *see also* Affidavit, ECF No. 62-2.  BLM, however, never undertook the requisite NEPA analysis to ensure its leasing decision was made in an environmentally sensitive manner.  WEA's argument thus highlights the fact that any harm due to vacatur lies with BLM, not the Conservation Groups.  Furthermore, courts have repeatedly rejected prospective economic harms, like those alleged by WEA's member, as a basis to forego the presumptive remedy of vacatur to protect the public interest.  *See S. Utah Wilderness All. v. Kempthorne*, 525 F.3d 966, 970 (10th Cir. 2008) (explaining that "restraining unlawful action for the common good" may impact private economic interests, but that permitting "those whose interest have been incidentally affected in such cases to protest at the last minute . . . would sever only to disrupt the public interest and comes at too high a price").

---

[12] WEA has moved for permission to file an amicus brief in support of BLM in this action, but WEA's motion has not yet been granted.  Unopposed Mot. For Leave to File Br. of Amicus Curiae W. Energy All., ECF No. 62.  In anticipation of a ruling on WEA's motions, the Conservation Groups address WEA's arguments here.

WEA also omits any discussion of BLM's significant NEPA violations, claiming that the agency cannot set aside its "authority and obligation" to promote oil and gas development. WEA Br. at 4–5. However, WEA's contention is sorely misplaced and based on a World War II era notion of leasing that fails to account for BLM's substantive and procedural obligations to comply with environmental laws, including NEPA and the Federal Land Policy and Management Act. *See, e.g.*, 43 U.S.C. § 1701(a)(8) (requiring BLM to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values"). As noted above, multiple courts, including the Tenth Circuit, have vacated leases due to violations of these laws.

Industry-Intervenors attempt to mischaracterize the Conservation Groups' request for relief, claiming that it constitutes a request for a permanent injunction. IPAA Resp. at 27–31. IPAA's contention entirely misses the mark. First, the Conservation Groups request only that this Court vacate the leases at issue, not that the Court require BLM to take, or refrain from taking, any particular action. *See* Cornell Law School, Legal Information Institute, *Permanent Injunction* (last visited Nov. 22, 2019), https://www.law.cornell.edu/wex/permanent_injunction (defining a permanent injunction to be "[a] court order that a person or entity take certain actions or refrain from certain activities"). Notably, BLM itself does not even claim that the requested relief is for a permanent injunction.[13] *See* BLM Resp. at 21–22. Second, the Tenth Circuit clearly distinguishes between vacatur and permanent injunctive relief, determining that permanent injunctive relief is likely unnecessary where the challenged agency action is vacated. *See Diné Citizens Against Ruining Our Environment*, 923 F.3d at 859 ("Because vacatur is

---

[13] Industry-Intervenors rely on *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1239 (10th Cir. 2017), in which the court declined to vacate challenged coal leases. IPAA Resp. at 27. However, the court determined that vacatur was not appropriate in that case because the plaintiffs challenged only a narrow issue, the parties had not adequately addressed the issue of remedy, and three of the leases at issue were already being mined. *WildEarth Guardians*, 870 F.3d at 1239. None of these circumstances are present in this case.

'sufficient to redress [Appellants'] injury, no recourse to the *additional* and extraordinary relief of an injunction [is] warranted.'" (emphasis added, alterations in original)).[14]

Ultimately, vacatur is necessary to ensure that BLM fulfills NEPA's mandate to take a hard-look at the impacts and alternatives prior to irretrievably committing the lands in the June 2018 lease sale to development.  As this Court has explained, absent a limit on a developer's ability to proceed with operations while agencies correct NEPA violations, "compliance with NEPA could become a mere bureaucratic formality."  *Diné Citizens Against Ruining Our Env't*, No. 12-cv-01275-JLK, 2015 WL 1593995, at *3.  Vacatur is therefore appropriate and necessary to "avoid subjecting conservation groups' valid objections to the 'bureaucratic steamroller.'" *WildEarth Guardians*, No. 19-CV-001920-RBJ, 2019 WL 5853870, at *14.

## CONCLUSION

For the foregoing reasons, the Conservation Groups respectfully request that this Court grant the Petition for Review of Agency Action, find that BLM violated NEPA, and vacate the June 2018 leasing decision.


Respectfully submitted this 6th day of December 2019,


/s/ *Stuart Gillespie*
Stuart C. Gillespie, CO Bar No. 42861
Robin Cooley, CO Bar No. 31168
Caitlin Miller, CO Bar No. 50600
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Phone: (303) 623-9466
sgillespie@earthjustice.org
rcooley@earthjustice.org
cmiller@earthjustice.org

---

[14] Should the Court find further discussion of whether the Conservation Groups would satisfy the standard for obtaining a permanent injunction beneficial, the Conservation Groups request additional briefing to address this issue.

*Attorneys for Plaintiffs Rocky Mountain Wild, National Parks Conservation Association, Center for Biological Diversity, and WildEarth Guardians*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word-count limitation of 10,000 words set by this Court, *see* Revised Joint Case Management Plan for Petition for Review of Agency Action, ECF No. 53 at 5, as it contains 8,139 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

/s/ *Stuart Gillespie*
Stuart C. Gillespie

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2019, I filed the foregoing with the Court's electronic filing system, thereby generating service upon the parties of record.

Michelle-Ann C. Williams
United States Department of Justice
Natural Resources Section
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: 202-305-0420
Email: michelle-ann.williams@usdoj.gov

John S. Most
United States Department of Justice
Natural Resources Section
Environmental and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 616-3353
Email: john.most@usdoj.gov
*Attorneys for Federal Defendants*

Ivan L. London
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, CO 80203-4541
Tel: (303) 861-7000
Email: ivan.london@bclplaw.com

*Attorneys for Proposed Amicus Curiae*
*Western Energy Alliance*

Steven J. Rosenbaum
Covington & Burling LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com
Bradley K. Ervin
Covington & Burling LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-5860
Fax: (202) 662-6291
bervin@cov.com

*Attorneys for Intervenor-Defendants*
*American Petroleum Institute &*
*Independent Petroleum Association of*
*America*

/s/ *Stuart Gillespie*
Stuart C. Gillespie

24