IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 18-cv-02468-MSK

ROCKY MOUNTAIN WILD,
NATIONAL PARKS CONSERVATION ASSOCIATION,
CENTER FOR BIOLOGICAL DIVERSITY, and
WILDEARTH GUARDIANS,

    Plaintiffs,

*v.*

DEB HAALAND,[1] in her official capacity as Secretary of the Interior, and
BUREAU OF LAND MANAGEMENT,

    Defendants,

*v.*

AMERICAN PETROLEUM INSTITUTE,
INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA,
UTAH PETROLEUM ASSOCIATION, and
STATE OF UTAH,

    Intervenor-Defendants.

---

### OPINION AND ORDER ON THE MERITS

---

**THIS MATTER** comes before the Court for resolution of the Plaintiffs' claims on the merits. The Court has reviewed the Administrative Record **(# 45)**, as well as the parties' briefing **(# 55, 59, 61, 62-1, 63)**.

### FACTS

The Bureau of Land Management ("BLM") oversees federally-owned land in, among other areas, the northwest Colorado counties of Moffat, Routt, Jackson, and Rio Blanco. The

---

[1]    The Court *sua sponte* substitutes the current Secretary of the Interior for the former one.

1

lands at issue in this case fall variously within the BLM's White River, Little Snake, and Kremmling Field Offices. In the early 2010s, each of the relevant field offices issued broad Resource Management Plans ("RMPs"), setting forth the BLM's general management priorities for the lands within their jurisdiction. In each case, the RMPs adopted by the field offices contemplated a balance of resource conservation and resource development, including the expectation that certain lands within each field office's jurisdiction would be leased for oil and gas development. Consistent with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., each of the RMPs was supposed by an Environmental Impact Statement ("EIS") that extensively analyzed the environmental effects of the BLM's chosen management strategies and potential alternative management approaches. Although the contents of the RMPs and their supporting EISs are relevant in this case, the decisions embodied in those documents have already become final and are not subject to review or independent consideration at this time.

Pursuant to the management priorities expressed in the RMPs, in June 2017, the BLM considered whether to auction off oil and gas development leases on roughly 100,000 acres within each of the field offices' jurisdiction. In making that decision, the BLM conducted an Environmental Assessment ("the 2017 EA") of the potential environmental consequences of leasing, ultimately concluding that leasing was appropriate. As with the RMPs, the 2017 EA is of considerable relevance to this case, but the decisions embodied in that document are final and not subject to independent review now.

In June 2018, the BLM proposed auctioning off another batch of oil and gas leases on the lands in question, amounting to roughly 58,000 additional acres. This time, instead of conducting another EA, the BLM decided that the EA developed for the 2017 leases, in conjunction with the EIS prepared for the 2015 RMPs, provided a sufficient assessment of

2

environmental issues arising from the decision to lease, and that no substantial additional environmental analysis was not necessary.  The BLM issued a "Determination of NEPA Adequacy" ("the 2018 Determination"), adopting the analysis contained in the earlier NEPA documents without substantial modification or comment and approving the decision to auction off the leases.  The June 2018 lease auction proceeded and most of the parcels offered were leased.

The Plaintiffs are environmental advocacy organizations that oppose the BLM's 2018 decision to grant oil and gas leases on the lands in question.  The Plaintiffs point out that oil and gas development activities result in the release of air pollutants that combine to form ozone and particulates, degrading the air quality in affected areas and that substantial portions of the lands at issue here already suffer from harmful levels of ozone and effects of particulate matter associated with oil and gas development.  The Plaintiffs commenced this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, contending that the BLM's issuance of the 2018 Determination was arbitrary and capricious and contrary to law.  The Plaintiffs allege that in adopting the Determination, the BLM violated NEPA, due to the BLM's failure to adequately consider environmental effects from that decision, failure to consider reasonable alternatives to leasing, and failed to prevent the unnecessary degradation of public lands.

As framed by the parties' briefing, the Plaintiffs assert the following arguments for resolution here: (i) by relying on the 2017 EA, the BLM failed to consider more accurate air monitoring data and modeling that became available after the 2017 EA was issued, resulting in the BLM ignoring evidence of adverse air quality impacts that will result from additional leasing in 2018; (ii) the BLM failed to consider the effects that leasing in 2018 would have on lands that

3

the BLM had previously identified as having wilderness characteristics; and (iii) the BLM failed to consider a "no action" alternative in which no additional leasing would be offered in 2018.

## ANALYSIS

### A. Statutory framework

#### 1. APA

The APA provides the mechanism by which courts are authorized to review final agency actions.  Under the APA, the Court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  A decision is arbitrary or capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency" or where the action "is so implausible that it could not be ascribed to a different in view or the product of agency expertise."  *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1222 (10th Cir. 2020).  The Court affords the agency's decisionmaking a presumption of validity and the burden is on the party challenging it to demonstrate that the decision is arbitrary and capricious.  *Id.*

#### 2. NEPA

NEPA requires federal agencies to "pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."  *High Country Conservation Advocates v. U.S. Forest Service*, 951 F.3d 1217, 1223 (10th Cir. 2020).  Before making a decision that could have environmental consequences, the agency must first conduct an EA to determine whether the action is likely to "significantly affect the quality of the human environment," as well as consider any alternatives to the

4

proposed action.  42 U.S.C. § 4332(2)(C).  If, after conducting the EA, the agency concludes that the project will not have significant environmental effects, it may issue a "finding of no significant impact," ending the environmental analysis.  40 C.F.R. § 1501.6.  Otherwise, the agency must proceed to conduct an extensive examination of potential environmental effects of each possible alternative, producing a comprehensive EIS.

NEPA describes only procedural requirements; so long as those requirements are followed, the Court does not concern itself with the wisdom of the agency's decisionmaking. *New Mexico ex. rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th Cir. 2009).  As the Supreme Court has stated, NEPA "prohibits uninformed – rather than unwise – agency action."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).  The touchstone of the Court's inquiry is whether the agency "took a hard look at information relevant to the decision," that is, whether the agency "did a careful job at fact gathering and otherwise supporting its position."  *Richardson,*, 565 F.3d at 704.

### B.  Consideration of air monitoring and modeling

The Plaintiffs first argue that, by adopting the 2017 EA instead of conducting a new EA for the 2018 lease auction, the BLM failed to consider new data and more reliable air pollution monitoring that had become available in the interim.

Before it addresses the 2017 EA's findings relating to air pollution, and ozone in particular, the Court pauses to identify two pertinent issues.  First, the BLM's environmental decisionmaking is based, in part, on complex simulated air pollution models called CARMMS.  In the 2017 EA, the BLM explained that CARMMS "assesse[s] statewide impacts of projected oil and gas development [ ] out to year 2021 for three development scenarios (low, medium, and high)."  It is undisputed that the 2017 EA used calculations from CARMMS version 1.5, and that

5

in August 2017, the BLM updated CARMMS to version 2.0. CARMMS 2.0 is more effective in modeling wintertime ozone formation and caried other improvements (including extending projections out to 2025 instead of 2021). In addition, CARMMS 2.0 employed real-world data from 18 additional air monitors, including one in Rangely, Colorado, whereas CARMMS 1.5 used regional estimates to predict data in that area. The Plaintiffs' briefing originally contended that the BLM's failure to consider CARMMS 2.0 modeling as part of the 2018 leasing decision, and its reliance instead on the 2017 EA's CARMMS 1.5 modeling, constituted a NEPA violation. The BLM argued in its response that its CARMMS 1.5 modeling produced "functionally equivalent data" to that that CARMMS 2.0 would have generated. In their reply brief, the Plaintiffs do not appear to substantially dispute that the two models produced roughly equivalent outcomes. Instead, the Plaintiffs argue that "[e]ven assuming BLM had 'functionally equivalent' data to CARMMS 2.0 when it prepared the 2017 EA, [ ] it disregarded that evidence in the 2017 EA. . . The problem [ ] is not CARMMS 1.5 itself. . . BLM's failure to analyze its modeling results – whether CARMMS 1.5 or CARMMS 2.0 – to assess the impacts of the June 2018 leasing decision violates NEPA."

Second, the Court notes that the Environmental Protection Agency has established National Ambient Air Quality Standards ("NAAQS") for various pollutants. Exposure to pollutant concentrations in excess of the NAAQS "has been shown to have a detrimental impact on human health and the environment." AR 11366-67.[2] The NAAQS for ozone is 70 parts per billion. AR 11369. The 2017 EA reported that Rio Blanco County exceeded the NAAQS for ozone in 2011 (at 73 ppb) and 2013 (at 91 ppb), but was below that standard for 2012 (69 ppb),

---

[2] Citations to AR ___ refer to the cited page in the administrative record (#45).

2014 (62 ppb) and 2015 (66 ppb), the last year of historical data cited in the EA.[3] AR 11371. The 2017 EA notes that "exceedances by themselves do not mean that the area will be designated as nonattainment," explaining that the decision to declare NAAQS non-attainment is done by the Colorado Department of Public Health and Environment and the U.S. EPA, not by the BLM.

The Court begins by summarizing the 2017 EA's discussion of air quality effects from the leasing decision begins. The BLM specifically explained that it intended to defer much of its air quality analysis until later in the leasing process:

> The BLM cannot forecast the number of wells that would ultimately be developed on any particular parcels, or as part of a grouping of such parcels for any lease sale over what could be several years and potentially multiple phases of development (even on individual parcels). Additionally, the BLM cannot confidently estimate what economically viable quantities of oil and gas resources could exist for any parcel. . . . The BLM cannot know with certain what exact methods or well development may or may not be employed by any successful bidder of a nominated parcel . . . . The methods for extraction and gathering and their relative intensities will be highly dependent on the types and quantities of any resources found. This also holds true for claims suggesting that hydraulic fracturing and directional drilling are reasonably foreseeable outcomes resulting from the decision to place the nominated parcels up for sale.

AR 11362. Later, under the heading of "Environmental Consequences Of Leasing And Development," the BLM again indicated its intention to defer substantial air quality analysis until in the permitting process:

> Developmental air impacts will be addressed in further detail in a subsequent analysis when lessees file an Application for Permit to Drill (APD). The analysis will determine if any contemporaneous

---

[3] The BLM's brief argues that a single-year exceedance of the EPA's ozone limit is irrelevant because "attainment" levels are based on three-year averages. The EA explains that "multiple year average concentrations" can be derived by "summ[ing] three consecutive years of data [ ] and divid[ing] by three." AR 11371. Using that 3-year average, it appears that Rio Blanco County has been in excess of the EPA ozone limit of 70 parts per billion continuously between 2013 and 2015. The three year average for 2011-2013 is (70 + .69 + .91)/3, or 77. The three year average for 2013-2015 is (91 + 62 + 66)/3, or 73. AR 11372.

> incremental increases from project emissions cause significant impacts at the local and regional scales. All proposed activities including, but not limited to, exploratory drilling activities would be subject to applicable local, State, and Federal air quality laws and regulations.
>
> Subsequent activity authorized through APD or other approval could include soil disturbances resulting from the construction of well pads, access roads, pipelines, power lines, and drilling. Any disturbance is expected to cause increases in fugitive dust and potentially inhalable particulate matter . . .in the project area and immediate vicinity. Particulate matter, mainly dust, may become airborne when drill rigs and other vehicles travel on dirt roads to drilling locations. Air quality may also be affected by exhaust emissions from engines used for drilling, transportation, gas processing, compression for transport in pipelines, and other uses.
>
> [. . .] Ozone formation and prediction is complex, and generally results from a combination of significant quantities of [volatile organic compounds] and [nitrogen oxide] emissions from various sources within a region. Ozone has the potential to be transported across long distances. During exploration and development, 'natural gas' may at times be flared and/or vented (for safety) from conventional, coal bed methane, and shale wells (depending on the resources present on the lease). The gas is likely to contain volatile organic compounds that could also be emitted from reserve pits, produced water disposal facilities, and/or tanks located at the site. The development stage may likely include the installation of pipelines for transportation of raw product. New centralized collection, distribution and/or gas processing facilities may also be necessary.

AR 11382.

Nevertheless, the record reflects that, through CARMMS modeling, the BLM "has developed an estimated average per well emissions inventory based on current resource recovery methods [ ] and our knowledge of development for areas similar to those parcels that have been nominated for lease." AR 11383. It also attempted to project the number of new wells that would be drilled in each of the 5 years between 2017 and 2021. AR 11386. Combining those two calculations, the BLM projected the annual emissions that could be expected by 2021. AR

8

11386.  It also projected a "quasi-cumulative [ ] summary of estimated ozone [ ] impacts for all of the projected Federal oil and gas emissions" resulting from the additional leasing.  As pertinent to the White River Field Office, the BLM estimated an additional 1.0 parts per billion increase in "Overall maximum [ ] ozone contribution" and .3628 parts per billion in "Maximum [ ] contribution to modeled exceedance" of the ozone NAAQS.  AR 11387.   The BLM concluded that these amounts "are minimal with respect to the [ ] ozone standard."  Thus, the BLM concluded that "air quality impact contributions associated with all projected federal oil and gas development for each of the field offices where proposed lease parcels are located are expected to be minimal."  Indeed, the BLM went on to stated that "it is reasonable to conclude that project or lease-level [oil and gas] development would have even lower contributions to the overall cumulative air quality" than the CARMMS models projected, because "current oil and gas development rates are tracking at or below CARMMS' "low" modeling scenario.  AR 11388-89.  AR 11390 is a map depicting the BLM's estimates of "Predicted ozone reductions" occurring by 2021 compared to 2008 ozone levels.  It predicts slight <u>reductions</u> of ozone levels in Moffatt County, roughly in the vicinity of Dinosaur National Monument, and in Rio Blanco County, roughly in the vicinity of Rangely, Colorado.

The findings in the 2017 EA are sometimes difficult to square with other evidence in the record.  Although the 2017 EA predicted "minimal" (or even improving) ozone conditions resulting from leasing, the Plaintiffs allege, and the BLM concedes, that CARMMS 2.0 modeling, even using the same "low development" scenario recited in the 2017 EA, predicts "some exceedances of the ozone NAAQS on the western edge of Colorado along the Utah border" through 2025.  AR 15267.  The record seems to suggest that CARMMS 2.0 modeling concludes that ozone levels at a monitor in Rio Blanco County in 2025 will be 74.3 ppb,

9

significantly in excess of the NAAQS limit of 70. *See Docket # 55, Ex. 1*. The 2017 EA makes no mention of these expected exceedances,[4] much less explains why the BLM deemed them to be insignificant. The 2017 EA shrugs off past exceedances of the ozone NAAQS, suggesting simply that "[e]xceedances by themselves do not mean that the area will be designated as nonattainment" by other agencies. But that is a non-sequitur. A declaration of "nonattainment" is an administrative one, and there can be any number of reasons, from bureaucratic to practical to political, that might prevent the state or the EPA from declaring portions of Rio Blanco County as "nonattainment" for ozone. Even so, the fact remains that portions of Rio Blanco County exceeded the NAAQS for ozone twice between 2011 and 2015, and are projected to continue to do so in the future. As the 2017 EA acknowledges, "exposure to air pollutant concentrations greater than the NAAQS has been shown to have a detrimental impact on human health and the environment." AR 11367-68. Even assuming (without necessarily finding) that the BLM is not required to undertake extensive <u>particularized</u> air pollutant analyses until lessees actually seek drilling permits, *see Rocky Mountain Wild v. Bernhardt*, 506 F.Supp.3d 1169, 1184 (D. Utah 2020), the BLM may not simply ignore evidence of reasonably foreseeable environmental effects that is available to it at the time it makes its decisions. *See Dine v. Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831, 853-54 (10th Cir. 2019) (finding that BLM was required to consider the <u>cumulative</u> effects of <u>all</u> 3,960 wells predicted by a reasonably foreseeable development estimation at the time it evaluated <u>individual</u> applications

---

[4] The BLM's brief asserts that its CAARMS 1.5 model "similarly predicted ozone exceedances over a single year," but its citation for that proposition is to <u>historical</u> evidence in the 2017 EA, not predictions of future evidence. *Citing* AR 11372. As best the Court can tell from full-text searching of the 2017 EA, the word "exceedance" is never used in the 2017 EA in the context of assessing predicted <u>future</u> exceedances of the ozone NAAQS.

for permits to drill).[5]  Here, the CARMMS 2.0 modeling of ozone effects was available to the BLM at the time it made the 2018 leasing decision, and the BLM's own general estimates of "low development" of the potential leases revealed the potential for significant exceedances of ozone standards in and around Rio Blanco County.  In such circumstances, the BLM was required to consider those foreseeable effects at the time it made the leasing decision.  For this reason alone, the BLM's adoption of the 2017 EA as the sole support for the 2018 leasing decision violated NEPA.[6]

### C. Lands with wilderness characteristics

In 2012 and 2013, the BLM surveyed several areas within the Little Snake Field Office, concluding that those areas had "wilderness characteristics."  *See* 16 U.S.C. § 1311(c) (defining "wilderness" area as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions").  It is undisputed that the BLM is obligated to specifically consider the impacts that its land use decisions might have on areas identified as

---

[5]   Here, the BLM noted that "the most recent [Field Office] Reasonably Foreseeable Development" estimations constituted its "high development" scenario, whereas a "project[ion of] the current 5 year average development paces forward to 2021" constituted the "low development" scenario.  Finding that it more accurately estimated actual development patterns, the BLM decided to base its analysis in the 2017 EA on the "low development" scenario.  This Court need not consider at this time whether *Dine* requires the BLM to assess air quality impacts according to the "low" or "high" development scenario.

[6]   The Plaintiffs also make an abbreviated argument that, by ignoring the CARMMS 2.0 modeling, the BLM overlooked evidence that leasing would result in greater particulate emissions, which would result in visibility impairments at Dinosaur National Monument.  The 2017 EA expressly declined to engage in any analysis of standards for visibility or particular deposition, choosing to defer that issue to "the project permitting/development phase" and that "no further discussion or analysis of [particulates] is needed."  AR 11374.  Because the Court finds that CARMMS 2.0 modeling of particulate emissions was available to the BLM at the time it made the 2018 leasing decision, the BLM was required to consider such modeling as it related to generally foreseeable development practices, without awaiting the permitting phase.

11

having wilderness characteristics. *See e.g. Vermonters For A Clean Environment v. Madrid*, 73 F.Supp.3d 417, 431 (D. Vt. 2014).

The 2017 EA expressly found that "There are no inventoried lands with wilderness characteristics overlapping lease parcels in the [Little Snake Field Office]." AR 11534. That may have been a true statement for the 2017 lease sale, but the Plaintiffs have asserted, without dispute from the BLM, that parcels designated in the 2018 lease sale overlap with lands in the Little Snake Field Office identified in 2012 and 2013 as having wilderness characteristics. *Docket* # 55 at 21. The 2017 EA contains only generic discussion of the impacts that oil and gas leasing can have on wilderness areas, simply noting that development can "create roads, structures, traffic and lighting which can decrease wilderness characteristics." It proposed that, for certain areas with wilderness characteristics, impacts could be minimized or avoided through "No Surface Occupancy" or "Controlled Surface Use" stipulations that could be preemptively applied to certain leases at the lease sale stage (but which were not applied for the 2018 lease sale), and anticipated that, otherwise, "site-specific mitigation measures" could be "added at the [permitting] stage." AR 11534-35.

The BLM argues that it "considered impacts from various activities" at the time it drafted the overarching RMPs covering the lands at issue. Although those RMPs were amended in some respects as recently as 2015, the record reflects that their substantive contents were drafted in 2011, before the BLM conducted the 2012 and 2013 wilderness inventories at issue here. Thus, there is no real dispute that the RMP for the Little Snake Field Office does not discuss the identified wilderness lands with any specificity. The RMPs did identify certain other lands with wilderness character that the BLM affirmatively decided to protect, and the RMPs specifically closed those areas to oil and gas leasing. Lands with wilderness character that did not receive

12

such protection fell within the BLM's explanation that for "other areas of lands with wilderness characteristics," it was consciously deciding that those areas would "not [be] managed to protect such characteristics and could lead to a loss of wilderness characteristics in the region." AR 2606. The BLM argues that, because it "opted to allocate [the particular lands at issue here] as open to oil and gas leasing," it necessarily concluded that those lands fell within the general decision in the RMPs that wilderness characteristics alone did not warrant protection against oil and gas leasing.

The gist of the BLM's argument is that, through the RMPs, it identified the areas with wilderness characteristics that it intended to protect, enacted appropriate protections for those areas, and decided that all remaining areas with wilderness characteristics could nevertheless be leased, even if that meant sacrificing those areas' existing wilderness character. That might have been a valid exercise of agency discretion, but only as to wilderness areas that the BLM was specifically aware of at the time the RMPs were drafted. One cannot possibly argue that the BLM made a conscious, considered evaluation of the merits of protecting a specific wilderness area if the BLM was not aware of the existence of that wilderness area at the time it made its decision. Because the wilderness areas identified by the Plaintiffs were not inventoried by the BLM until after the substance of the Little Snake Field Office RMP was drafted in 2011, the Court cannot conclude that the RMP gave due consideration to the question of whether those <u>particular</u> areas should be protected.

The BLM argues that it "is capable of weighing impacts to environmental and recreational values [of lands] . . . regardless of whether they have been formally inventoried." That argument may or may not be accurate as it applies to lands that have no particular distinguishing characteristics. But it is patently untrue with regard to lands that are determined

13

to have <u>specialized</u> characteristics – axiomatically, the BLM cannot evaluate potential impacts to those specialized characteristics until it first becomes aware that those characteristics exist. To hold otherwise would produce absurd results: imagine that the BLM were to designate an area as appropriate for leasing in an RMP, only to later discover that the area is the only known habitat of a unique and fragile species that would be extinguished by development. The BLM's argument here would suggest that the new discovery is not a grounds to revisit the RMP's decision to offer the land for development – after all, the BLM was "capable of weighing impacts" to lands "regardless of whether they have been formally inventoried." Obviously, the discovery of new information about lands that were previously approved for development requires the BLM to specifically consider whether that new information justifies a change in management objectives. Here, because there is no indication that the BLM ever specifically considered whether the discovery of wilderness character identified in certain lands in 2012 and 2013 warranted a change in the management priorities assigned to those lands in the RMP in 2011, the Court finds that the BLM did not engage in the informed decisionmaking that is required under NEPA. It may be that, upon further evaluation, the wilderness character in the identified lands is not so significant that it outweighs the reasons why the BLM selected those particular parcels for leasing in the first place. But NEPA requires the BLM to at least <u>consider</u> that question. Because it has not done so, the 2018 leasing decision as to those parcels in the Little Snake Field Office violated NEPA.

### D. Failure to consider alternatives

Finally, the Plaintiffs argue that the 2018 leasing decision violated NEPA because the BLM did not consider a "no action alternative" as part of the consideration of the lease sale. The consideration of reasonable alternatives to the contemplated action is "at the heart of [the]

14

NEPA" analysis. *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 757 (2004). Regulations implementing NEPA make clear that agencies should always consider a "no action" alternative alongside the preferred alternative being evaluated. 40 C.F.R. § 1502.14(c).

The 2017 EA specifically considered a "no action" alternative:

> Under the No Action Alternative, BLM would defer all nominated lease parcels from the June 2017 lease sale. The parcels could be considered for inclusion in future lease sales. Surface management would remain the same and ongoing oil and gas development would continue on surrounding private, state, and federal leases. This alternative was supported by numerous members of the public during the initial scoping period.

AR 11356. The BLM analyzed – briefly – the environmental and practical consequences of the no action alternative:

> The No Action Alternative is used as the baseline for comparison of the alternatives. Under the No Action Alternative, the 106 parcels totaling 101,031.200 acres would not be leased. <u>There would be no subsequent impacts from oil and/or gas construction, drilling, and production activities</u>. The No Action Alternative would result in the continuation of the current land and resource uses in the proposed lease areas.
>
> BLM assumes that the No Action Alternative (no lease option) may result in a slight reduction in domestic production of oil and gas. This reduction would diminish federal and state royalty income, and increase the potential for federal lands to be drained by wells on adjacent private or state lands. The public's demand for oil and gas is not expected to change; oil and gas consumption is driven by a variety of complex interacting factors including energy costs, energy efficiency, availability of other energy sources, economics, demographics, and weather or climate. If the parcels are not leased, energy demand would continue to be met by other sources such as imported fuel, alternative energy sources (e.g., wind, solar), and other domestic fuel production. This displacement of supply could offset any reductions in emissions and disturbance achieved by not leasing the subject tracts in the short term.

AR 11361 (emphasis added).

15

The Plaintiffs argue that the discussion of the no action alternative in the 2017 EA does not suffice because "[t]he 2017 EA involved an entirely different lease sale with completely different parcels in different locations. As such, the 2017 EA never considered whether or not to lease any of the 58,573 acres of public lands at issue in this June 2018 lease sale." This is true – the 2017 EA obviously did not consider the decision to lease the 2018 parcels. But the 2018 Determination does not purport to suggest to the contrary. Rather, the 2018 Determination explained the BLM's conclusion that "the direct, indirect, and cumulative effects that would result from implementing the new Proposed Action" – the 2018 lease sale – "are the same as or similar to those analyzed, both qualitatively and quantitatively, in the existing NEPA documents." AR 15800 (emphasis added). The BLM does not assert that the 2017 EA formally considered issues relating to the 2018 leases. Rather, it asserts that because the 2017 and 2018 lease sales are generally similar in the size, location, and nature of the lands at issue, the analysis of alternatives and environmental impacts in the 2017 EA is sufficient to adequately advise the BLM of the similar alternatives and environmental impacts at issue in 2018 leasing decision as well.

The Court cannot say that this determination is arbitrary or capricious or contrary to law. Indeed, the Plaintiffs do not point to any way in which the potential environmental impacts flowing from the no action alternatives in 2017 and 2018 differ. In both cases, deciding to not lease the nominated parcels would simply continue existing management actions on the lands at issue, introducing no new environmental impacts of any kind.[7] Thus, the 2018 Determination's

---

[7] The Plaintiffs argue that "geographic and resources conditions of the 2017 and 2018 lease sales are [not] sufficiently similar" because none of the lands at issue in 2017 had wilderness characteristics and the 2017 EA did not adequately consider new ozone data. But that information is not germane to an analysis of the "no action" alternative, which is what the Plaintiffs argue that the 2018 Determination erred in not adequately considering. It may be that, in (re-) considering the preferred alternative – proceeding with the 2018 lease sale – the BLM

finding that the 2017 EA's discussion of a no action alternative was suitable for 2018 purposes was in conformance with NEPA.

**E. Remedy**

The Plaintiffs have asked that, if the Court finds error in the BLM's decisionmaking process, the Court "vacate the leases and remand the matter to BLM for further analysis." The BLM argues that the Court should simply remand the matter, leaving it to the BLM to decide whether vacatur of the existing leases is warranted.

In *WildEarth Guardians v. U.S. Bureau of Land Management*, 870 F.3d 1222, 1240 (10th Cir. 2017), the 10th Circuit considered the question of whether to vacate leases that had been granted by the BLM pursuant to a leasing decision that was later found to have violated NEPA. The 10th Circuit acknowledged that "vacatur is a common, and often appropriate, form of injunctive relief granted by district courts." 870 F.3d at 1239. Yet in that case, the court "decline[d] to vacate the leases," offering three reasons: (i) because the "Plaintiffs challenge a fairly narrow issue," the court concluded that the district court "might fashion some narrower form of injunctive relief based on equitable arguments"; (ii) there were practical questions of "what will happen to the leases which have already been issued and whether mining the lease tracts should be enjoined" and the parties had not specifically addressed that issue; and (iii) there was evidence that some of the leases were already being developed by the time the 10th Circuit issued its decision. 870 F.3d at 1240.

*WildEarth Guardians* refutes the Plaintiffs' argument that the language of 5 U.S.C. § 706(2)(A) -- that a court "shall . . . set aside agency action" that violates the APA --

---

decides that adverse impacts to wilderness or ozone levels make the no action alternative more appealing that it initially was. But those concerns do not change the fact that the 2017 EA, as adopted by the 2018 Determination, adequately addressed the impacts that adopting a no action alternative would have.

17

automatically requires vacatur of leases issued pursuant to the overturned agency decision. Rather, the case makes clear that practical concerns, such as a lessee's reliance on the agency decision and the likelihood of the agency adhering to the initial decision upon remand, can inform the decision of whether vacatur of leases is an appropriate remedy.

Here, the Plaintiffs argue that, at least as of the time of the filing of their reply brief in late 2019, "none of the leases have been developed." That may or may not remain true at this time, but even assuming that it remains true, the record reflects that vacating the leases at this time could nevertheless have adverse practical consequences. Western Energy Alliance has filed an *amicus* brief specifically opposing the Plaintiffs' request for vacatur of the issued leases. That brief is supported by an affidavit from an Alliance member explaining that it "has a multi-year planning cycle for future development," that "infrastructure must be constructed well in advance of drilling wells," and that "in order to make capital planning decisions, [it] must have a clear idea of its development plan and future well locations." *Docket # 62-2*. Although preparation for development may not present the same justification for refraining from lease vacatur as actual development, the concerns raised by the *amicus* do bring this case closer to the 10th Circuit's decision in *WildEarth Guardians*.

Ultimately, the question of whether vacatur of the existing leases should accompany a remand of the 2018 leasing decision to the BLM turns on the extent and significance of the NEPA violations that this Court has found in this case. If the defects identified by this Court are minor, it may very well be that, upon remand, the BLM is likely to reconsider the issues but ultimately reach the same leasing decision. In that circumstances, premature vacatur of the existing leases would simply result in administrative delay and additional costs for all parties involved in order to re-lease the same lands.

Here, the Court finds that the NEPA failures discussed herein are relatively minor[8] and are unlikely to prompt fundamentally different decisionmaking by the BLM upon remand. Although the BLM erred in not considering ozone models created by CARMMS 2.0, it did give some consideration to ozone predictions modeled by CARMMS 1.5, ultimately finding that those predictions did not contravene the preferred alternative of leasing the nominated parcels for development. More accurate ozone modeling from CARMMS 2.0 might cause the BLM to preemptively impose additional ozone-reducing limitations on some leases, particularly in areas of historical exceedances, but it seems unlikely that the incremental upgrade in ozone modeling will result in the BLM deciding not to lease any of the parcels at issue. Likewise, consideration of localized impacts on areas with wilderness characteristics might result in the BLM modifying the lease terms on certain parcels in the immediate vicinity of those areas, but are unlikely to result in the BLM deciding to reject the entire slate of proposed leases. In such circumstances, wholesale vacatur of all of the 2018 leases would be excessively disruptive. The better course of action is to simply remand the 2018 leasing decision to the BLM for reconsideration and appropriate remedial action. If the BLM believes that certain leases require modification in light of that reconsideration, it is in a better position than this Court to identify and vacate those particular leases.

## CONCLUSION

For the foregoing reasons, upon consideration of the administrative record **(# 45)**, the Court finds that the BLM's 2018 leasing decision violated NEPA and the APA. The Court

---

[8]  Certainly, the issues addressed in this case are more "narrow" and minor than in *WildEarth Guardians*, where the 10th Circuit found that the entire economic justification for the BLM's selection of the preferred alternative over the no action alternative was "contradicted basic economic principles." 870 F.3d at 1237-38.

19

**REMANDS** that decision back to the BLM for further consideration consistent with the findings in this Opinion.

Dated this 28th day of September, 2021.

BY THE COURT:

Marcia S. Krieger
Senior United States District Judge